**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

JON D. BABB, DR. GEORGE G. KITCHENS,
CARL BAILEY, PAUL NEELY, DR. MICHAEL F.
CORCORAN, THOMAS T. MCCOY TRUST, DR.
PHIL O. NELSON, JOHN H. PICKEREL, PATRICK
G. RENN, EUGENE A. RICE, JR. GEORGE E.
SUMMERS, WAYNE C. BECKNER, and SAMUEL
C. BOWYER (AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF JAMES W. BOWYER),

Civil Action No.:_____

                          Plaintiffs,

**COMPLAINT**

    v.

**DEMAND FOR JURY TRIAL**

WADE HAMPTON GOLF CLUB, INC.,

                          Defendant.

Plaintiffs, Jon D. Babb, Dr. George G. Kitchens, Carl Bailey, Paul Neely, Dr. Michael F. Corcoran, Thomas T. McCoy Trust, Dr. Phil O. Nelson, John H. Pickerel, Patrick G. Renn, Eugene A. Rice, Jr., George E. Summers, Wayne C. Beckner, and Samuel C. Bowyer (as Personal Representative of the Estate of James W. Bowyer) ("Plaintiffs"), for their complaint against Defendant Wade Hampton Golf Club, Inc. ("Club" or "WHGC" or "Defendant"), hereby allege and state as follows:

## NATURE OF THE CASE

1.      This is a civil action for breach of contract, tortious breach of contract, fraud, negligent misrepresentation, violation of the North Carolina Unfair and Deceptive Trade Practices Act, dissolution, and declaratory judgment.  The Plaintiffs in this action are former members in good standing who have resigned from the private Wade Hampton Golf Club located in or near Cashiers, Jackson County, North Carolina.  Pursuant to the Club's Bylaws, these

members are rightfully owed equity redemptions (i.e., repayment of initial equity investments due following resignation) that the Club has refused to pay under false pretenses. Although the Club holds itself out as a world class golf club and promotes a public aura of success and prominence, in truth it has been besieged by financial peril over a period of many years due to poor leadership and fiscal mismanagement, resulting in spiraling costs for upgrades and improvements that ladened it with unanticipated debt. Instead of paying off its debt load in the normal course or assessing members in order to finance these escalating costs, the Club embarked upon a scheme to wrongfully withhold amounts rightfully due to resigning members as a form of de facto loan. The Club's website touts itself as "provid[ing] one of the best golf courses and most memorable golf experiences in the world," which is "matched only by an indescribably authentic social camaraderie [that] will forever be the hallmark of the Wade Hampton Experience." Unfortunately for the Plaintiffs, the hallmark of their Wade Hampton Experience has been the Club's broken promises to repay the equity redemption amounts. The Club's machinations to avoid repayment of its obligations support claims for tortious breach of contract, fraud, negligent misrepresentation, and unfair and deceptive trade practices, thereby entitling Plaintiffs to punitive damages, treble damages, attorneys' fees, and dissolution.

## PARTIES

2. Plaintiff Jon D. Babb is a United States citizen and resident of a state other than North Carolina who became a member of the Club in 1998 and resigned his membership in 2015.

3. Dr. George G. Kitchens is a United States citizen and resident of a state other than North Carolina who became a member of the Club in 1991 and resigned his membership in 2016.

4.     Carl Bailey is a United States citizen and resident of a state other than North Carolina who became a member of the Club in 1991 and resigned his membership in 2016.  Mr. Bailey is a former President of WHGC.

5.     Paul Neely is a United States citizen and resident of a state other than North Carolina who became a member of the Club in 1987 and resigned his membership in 2015.

6.     Dr. Michael F. Corcoran is a United States citizen and resident of a state other than North Carolina who became a member of the Club in 1996 and resigned his membership in 2016.

7.     Thomas T. McCoy Trust is a United States citizen and resident of a state other than North Carolina who became a member of the Club in 1996 and resigned his membership in 2016.

8.     Dr. Phil O. Nelson is a United States citizen and resident of a state other than North Carolina who became a member of the Club in 2001 and resigned his membership in 2016.

9.     John H. Pickerel is a United States citizen and resident of a state other than North Carolina who became a member of the Club in 1987 and resigned his membership in 2017.

10.     Patrick G. Renn is a United States citizen and resident of a state other than North Carolina who became a member of the Club in 1993 and resigned his membership in 2016.

11.     Eugene A. Rice, Jr. is a United States citizen and resident of a state other than North Carolina who became a member of the Club in 1987 and resigned his membership in 2018.

12. George E. Summers is a United States citizen and resident of a state other than North Carolina who became a member of the Club in 1993 and resigned his membership in 2016.

13. Wayne C. Beckner is a United States citizen and resident of a state other than North Carolina who became a member of the Club in 1997 and resigned his membership in 2019.

14. Samuel C. Bowyer (as Personal Representative of the Estate of James W. Bowyer) is a United States citizen and resident of a state other than North Carolina, and James W. Bowyer became a member of the Club in 1997 and resigned his membership in 2016.

15. Defendant WHGC is a North Carolina nonprofit corporation with its principal place of business in or near Cashiers, Jackson County, North Carolina.

## JURISDICTION AND VENUE

16. Plaintiffs claim equity redemption amounts owed to them by WHGC in the following amounts, not including interest, costs, attorneys' fees, treble damages, or punitive damages:

    a.  Jon D. Babb Equity Redemption Amount: $57,500

    b.  Dr. George G. Kitchens Equity Redemption Amount: $52,500

    c.  Carl Bailey Equity Redemption Amount: $52,500

    d.  Paul Neely Equity Redemption Amount: $42,500

    e.  Dr. Michael F. Corcoran Equity Redemption Amount: $62,500

    f.  Thomas T. McCoy Trust Equity Redemption Amount: $62,500

    g.  Dr. Phil O. Nelson Equity Redemption Amount: $42,500

    h.  John H. Pickerel Equity Redemption Amount: $42,500

     i.   Patrick G. Renn Equity Redemption Amount: $57,500

     j.   Eugene A. Rice, Jr. Equity Redemption Amount: $42,500

     k.   George E. Summers Equity Redemption Amount: $57,500

     l.   Wayne C. Beckner Equity Redemption Amount: $62,500

     m.  Samuel C. Bowyer (as Personal Representative of the Estate of James W. Bowyer) Equity Redemption Amount: $62,500

     n.   Total Equity Redemption Amounts: $698,000

17.    The amount of each Plaintiff's claims, including punitive damages, treble damages, and attorneys' fees, individually exceeds the amount in controversy requirement of $75,000, exclusive of interest and costs, for purposes of diversity jurisdiction.

18.    The Plaintiffs' claims unite to enforce a single right in which they have a common and undivided interest and therefore in the aggregate exceed the amount in controversy requirement of $75,000, exclusive of interest and costs, for purposes of diversity jurisdiction.

19.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the controversy is between citizens of different States and the amount in controversy exceeds $75,000 exclusive of interest and costs.

20.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, the contract at issue was formed and to be performed at least in substantial part in this judicial district, and the sole Defendant resides in this district.

# FACTUAL SUMMARY

## *The Club Bylaws Require Payment of Redemption Amounts to Plaintiffs*

### *Bylaws –Membership Classes*

21.     WHGC was organized in 1986 for the purpose of owning and operating a private golf club for the pleasure and recreation of its exclusive membership.

22.     Pursuant to its Articles of Incorporation, WHGC "shall have members which may be divided into such classes as shall be provided in the By-Laws.  The . . . rights of the members of each class shall be provided in the By-Laws."

23.     The Bylaws of WHGC were most recently amended in 2014 ("Bylaws").

24.     A true and correct copy of the Bylaws is attached as **Exhibit A** and incorporated herein.

25.     Section 1(a) of Article II of the Bylaws provides for nine classes of membership: Full Regular Members, Provisional Regular Members, Double Eagle Members, Associate Regular Members, Senior Members, Non-Resident Members, Clubhouse Members, Special Members, and Honorary Members.

26.     The different classes of membership have different rights and obligations under the Bylaws.

27.     A Regular Member is defined at Section 3(bb) of Article I of the Bylaws as a Full Regular Member, Provisional Regular Member, Double Eagle Member, Associate Regular Member, Senior Member, or any other class designated as a Regular Member by the Board.

28.     All Plaintiffs are former Regular Members of the Club.

29.     WHGC currently has approximately 300 Regular Members with full Club privileges.

30.     While new member initiation fees for those individuals joining WHGC have varied over the years, Full Regular Members currently pay an initiation fee of $140,000 at the time they join the Club.

31.     A Full Regular Member must own certain real property associated with the Club defined as a "Membership Lot" per Section 2(a) of Article II of the Bylaws.

32.     Per Section 3(a) of Article II of the Bylaws, a Provisional Regular Member commits to acquire ownership of a Membership Lot within a certain period of time, at which time "the Provisional Regular Member shall become a Full Regular Member automatically."

33.     Per Section 4(a) of Article II of the Bylaws, a Double Eagle Member must be under 52 years of age at the time of the offer of membership and commits to acquire ownership of a Membership Lot before attaining the age of 52, at which time (upon payment of an Initiation Fee and Annual Dues) "the Double Eagle Member shall become a Full Regular Member automatically."

34.     Double Eagle Members pay a reduced initiation fee when they are accepted for membership, pay lower annual dues compared to Regular Members, and are not required by the Bylaws to own real estate within the community.

35.     However, when a Double Eagle Member reaches age 52, he or she is then required to own qualifying real estate, pay into the Club the balance of the initiation fee for a new Full Regular Membership (approximately an additional $50,000, or more), and pay the higher "regular" dues going forward.

36.     This automatic transition from Double Eagle Member to Full Regular Member is often referred to by the Club as a "conversion."

37.     A Non-Resident Member may not own certain real property associated with the Club per Section 7(a) of Article II of the Bylaws.

38.     If a Non-Resident Member acquires a Membership Lot, then the Non-Resident Member may become a Full Regular Member upon payment of an Initiation Fee and Annual Dues and meeting other criteria per Section 7(c) of Article II of the Bylaws.

39.     To convert to a Full Regular Membership, a Non-Resident Member must pay into the Club an additional initiation fee understood to be at least $25,000.

40.     This transition from Non-Resident Member to Full Regular Member is often referred to by the Club as a "conversion."

*Bylaws –Equity and Redemption Amounts*

41.     At the time of becoming a member, each of the Plaintiffs paid a Membership Equity Fee.

42.     Membership Equity Fees are defined in Section 3(s) of Article I as the Membership Equity Fees charged and designated as equity upon acceptance of a Member into any class of membership pursuant to Article V.

43.     Per Section 1 of Article V of the Bylaws, the Board establishes the Membership Equity Fee for each class of Membership.

44.     Per Sections 1 and 2 of Article VII of the Bylaws, upon the resignation or death of a Member, the Club must repay that Member's "Redemption Amount," which is defined as the "amount equal to the Membership Equity Fee paid by the former Member at the time the former Member joined the Club, plus any Equity Assessments paid by such former Member."

45.     The Redemption Amounts owed to the Plaintiffs are set forth in Paragraph 16 above.

46. Per Section 3 of Article VII of the Bylaws, the priority of payment of the Redemption Amount is "in the order of the cancellation of the Membership certificates."

47. This order is known as the "Priority List."

48. All Plaintiffs are on the Priority List.

49. Per Section 4 of Article VII of the Bylaws, the Redemption Amount is paid to a former member according to his order on the Priority List "at such time as the Club admits a new Full Regular Member or Provisional Regular Member in accordance with these Bylaws."

50. When a Double Eagle Member becomes a Full Regular Member through conversion, then the Club has "admit[ted] a new Full Regular Member," and therefore the obligation of the Club to pay the Redemption Amount to the next former member on the Priority list is triggered.

51. Upon information and belief, since 2012, at least eighteen (18) Double Eagle Members have become Full Regular Members through conversion, thereby triggering the Club's obligation to pay the Redemption Amount to 18 former members on the Priority List; however, the Club failed to pay Redemption Amounts for any of these 18 admissions of a new Regular Full Member.

52. When a Non-Resident Member becomes a Full Regular Member through conversion, then the Club has "admit[ted] a new Full Regular Member," and therefore the obligation of the Club to pay an Equity Redemption to the next former member on the Priority List is triggered.

53. Upon information and belief, since 2012, at least eleven (11) Non-Resident Members have become Full Regular Members through conversion, thereby triggering the Club's obligation to pay the Redemption Amount to 11 former members on the Priority List; however,

the Club failed to pay Redemption Amounts for any of these 11 admissions of a new Regular Full Member.

54.     Upon information and belief, none of the substantial, additional initiation fees paid by those 29 Double Eagle Members and Non-Resident Members converting to Full Regular Member status—well over $1.0 million—has been allocated by the Club to pay equity redemption payouts to former, resigned Regular Members.

55.     Upon information and belief, the Plaintiffs are sufficiently high on the Priority List such that they presently are entitled to receive their Redemption Amounts.

### *Fiscal Mismanagement*

56.     WHGC holds its golf course out as being world class as evidenced by the following accolades:

  a. 2014 Golf Digest rated WHGC the 10th most beautiful course in America.
  b. Host of the 2013 USGA Senior Amateur Championship.
  c. Top 25 ranking in Golf Digest's Best 100 American Golf Courses.
  d. #1 Ranked Golf Course in the State of North Carolina.
  e. Ranked as the #1 Golf Course Community for the past nine years by Golfweek.
  f. 1987 Voted Best New Private Golf Course in the Country.
  g. Top 100 Golf Courses in the World by all credible ranking sources.

57.     In an effort to retain these rankings and not to lose its luster, the Club elected to pursue certain renovations and improvements in 2017.

58.     Following the July 4th holiday in 2017, WHGC closed the golf course and much of the then existing clubhouse in order to undertake significant renovations and improvements to both the golf course as well as the clubhouse.

59.     The golf course project was to include adding at least one new water retention/storage pond for water irrigation purposes, rebuilding or replacing all of the original 18 "greens" from the original course construction prior to 1987 (plus two "practice" putting greens)

along with performing considerable drainage and bunker restoration work, and replace all golf cart paths on the golf course as well as resurfacing most access roads and parking areas adjacent to the clubhouse.

60. Renovations or improvements to the golf course "turn house"—basically a snack bar and restrooms—and the clubhouse itself were also part of the Club's capital improvement project.

61. The estimated cost of this work was $5.72 million, a budget amount which the Club submitted to its members and was approved by a membership vote prior to commencement of the work, including a capital improvements assessment to be paid by the membership.

62. Further, the Club planned to develop, and did add, a new housing facility for the Club's seasonal employees that was projected to cost at least $1.1 million.

63. Evidently due to a combination of poor estimating, changes to the scope of work for the golf course and clubhouse renovation projects, and ineffective project management, the ultimate, final cost of the Club's capital improvement project in 2017-2019 skyrocketed to at least approximately $10.6 million, more than a 75% increase over the original budget approved by the membership.

64. As a direct result of the significant cost overruns, the Club was faced with severe financial pressures, which led to the Club instituting a new, second assessment to be paid by the members (in the amount of $7,500 per member) and a significant increase in bank financing as the total debt incurred by the Club during its projects ballooned to $11.70 million, in part to cover operating losses which were suffered by the Club when both the golf course and clubhouse were closed for the renovation project.

65.     In addition, as the direct consequence of the Club's financial strains in 2018-2020 and the mounting debt obligations resulting from the vastly over budget capital improvements projects, the Club—through its Board of Directors and management—searched for ways to avoid a financial catastrophe.

## *Misrepresentations, Concealment, and/or Unfair or Deceptive Practices*

### *Concealment and Misrepresentations*

66.     The Club has concealed from former members on the Priority List the number of conversions from Double Eagle Member or Non-Resident Member to new Full Regular Member.

67.     The Club has repeatedly represented to Plaintiffs, including once in January 2018 and once in January 2019, that equity Redemption Amounts will be refunded "[a]s soon as we receive a replacement member"; however, these representations were false because it has received qualifying replacement members through the conversion process that it failed to report to Plaintiffs and failed to result in equity redemption payments to former members.

68.     As a result, the Club intended to deceive Plaintiffs through a promise that it had no intention to perform, as evidenced by its consistent failure to pay Redemption Amounts to former Members following conversions from Double Eagle or Non-Resident Members to new Full Regular Members (unbeknownst to Plaintiffs).

69.     The Club possessed superior knowledge of its failure to pay Redemption Amounts to former Members following conversions from Double Eagle or Non-Resident Members to new Full Regular Members, and so Plaintiffs were justified in relying upon these false promises.

70. In a letter from the President to Members dated November 26, 2019, it was reported that there were 14 new memberships in 2019 to offset 10 resignations; however, the Club failed to pay out 14 equity Redemption Amounts.

71. The Club indicated to Plaintiff George Kitchens on January 16, 2020, that he moved up only two spots on the Priority List despite the 14 new memberships given by the Club in 2019 and despite the Club's indication in its Green Book (setting forth its members as of April 2019) that there were at least 3 new members in the classes of Full Regular Member or Provisional Regular Member as of April 2019.

72. Upon questioning by Plaintiff George Kitchens with respect to the reasons for his moving only two spots in the Priority List, the Club admitted in a letter dated February 18, 2020, that there were 7 new members in either the Full Regular or Provisional Regular classes, which moved Plaintiff George Kitchens up 7 spots on the Priority List in 2019.

73. Upon information and belief, there were additional new members in 2019 in either the Full Regular or Provisional Regular Member classes by way of conversion not included in the total of 7 reported by the Club, and the Club maintained and did not withdraw its false promise that equity Redemption Amounts will be refunded "[a]s soon as we receive a replacement member."

74. The November 26, 2019, letter further announced an intention to use the "majority of our 2020 initiation fees" to pay down bank debt, which would result in not paying these amounts toward equity Redemption Amounts.

75. The Club has falsely represented to Plaintiffs the number of new Full Regular Members by omitting conversions to new Full Regular Members.

76. The Club takes the unilateral and unreasonable position that it is obligated to refund the equity redemption amount to the next former, resigned member on the Priority List only when a Full Regular Member or a Provisional Regular Member is admitted to membership in the Club who had not previously been a Double Eagle Member or Non-Resident Member—even though the conversion of such a Double Eagle Member or Non-Resident Member results in a "new Full Regular Member" that triggers the obligation to pay the Redemption Amount to the next person on the Priority List.

77. Upon information and belief, as a result, the Club is unlawfully retaining at least $1.5 million in equity, interest free, that is due and payable to Plaintiffs in the amounts of their Redemption Amounts.

### *Suspension by Improper Amendment*

78. In a letter dated December 18, 2019, the Club announced to all current Members that its Board unanimously approved a unilateral suspension ("Suspension") of paying equity Redemption Amounts to former members on the Priority List (the "Suspension Letter").

79. A true and correct copy of the Suspension Letter is attached as **Exhibit B** and incorporated herein.

80. In the Suspension Letter, the Club's president and its treasurer informed the membership that $350,000 in equity redemptions owed to former, resigned Club members was to be used as a "contribution" to "cover accumulated debt."

81. This unilateral decision by the Club's leadership violated the Club's Bylaws as well as the North Carolina Nonprofit Corporation Act, N.C. Gen. Stat. 55A-1-01 et seq. (the "Act"); breached the agreement with former, resigned members who were entitled to be paid

equity redemptions; and was made without any consultation with, much less approval by, any of the former, resigned Club members who were affected thereby.

82.     The Suspension Letter justified the suspensions by stating:  "Though suspension of redemptions can be enacted by the Board at any time during the year, our bylaws require approval of such action by the membership at our next Annual Meeting, which will occur in October of 2020."

83.     This statement was false and misleading, as it falsely alleged that the Board had the unilateral authority to suspend obligations to pay Redemption Amounts to former members in accordance with the Bylaws provided that there is approval at the next Annual Meeting.

84.     Such authority is not granted by the Bylaws, as such an amendment violates the implied obligation of good faith and fair dealing as well as the Act, and therefore the justification offered by the Board to the membership was false.

85.     Further, the Board did not seek a vote on this issue at the Annual Meeting in October 2020, and instead lifted the Suspension effective July 1, 2020, after it became known to and then objected to by the group of affected former, resigned members.

86.     Upon information and belief, at the time of the Suspension Letter, the Board did not intend to seek a vote at the Annual Meeting but intended to lift the Suspension without submitting it to a vote once it successfully accomplished its purposes of not paying Redemption Amounts as new Full Regular or Provisional Regular Members were inducted in the first half of 2020.

87.     The Suspension deprived Plaintiffs of their crystallized right to receive the equity Redemption Amounts, which they relied upon at the time of the resignation of their Memberships.

88.     Accordingly, the Suspension violated the covenant of good faith and fair dealing under the Bylaws because it injured the right of the Plaintiffs to receive the benefits of the agreement, established within the Bylaws, thus depriving them of the fruits of the bargain.

89.     The Suspension violated the Bylaws when it was adopted without ever being voted upon by the Membership.

90.     Accordingly, the Suspension violated N.C. Gen. Stat. § 55A-10-21, which requires a vote by both the Board and a specified majority of the members to approve an amendment of the Bylaws.

91.     The Board also unilaterally chose not to bring the Suspension to a vote before the full Membership at the October 2020 annual meeting, thereby further demonstrating the Board's bad faith and failure to comply with section 55A-10-21.

92.     In the alternative, to the extent the Directors might be deemed to be authorized to vote on an amendment to the Bylaws without member involvement, the Suspension violated N.C. Gen. Stat. § 55A-10-20 because the Club failed to provide at least five days' written notice of any meeting of directors at which an amendment is to be voted upon in the form required by the statute (i.e., that it "shall state that the purpose, or one of the purposes, of the meeting is to consider a proposed amendment to the bylaws and contain or be accompanied by a copy or summary of the amendment or state the general nature of the amendment").

93.     The Suspension therefore was improper, ineffectual, void, and invalid under North Carolina law.

94.     Further, the Suspension is an unreasonable, arbitrary, capricious, and/or a discriminatory amendment to the Bylaws in light of the contracting parties' original intent and therefore invalid due to being contrary to North Carolina law under N.C. Gen. Stat. § 55A-2-06.

95.     In the alternative, and to the extent the Suspension might be found to be valid under the Bylaws and/or the Act, the Club's decision to lift the Suspension effective as of July 1, 2020, required the Club to pay equity Redemption Amounts for each of the new Full Regular or Provisional Regular Memberships instituted during the Suspension.

96.     However, the Club failed to do so.

97.     By letter dated March 17, 2021, the Club indicated that six such new Full Regular or Provisional Regular Memberships were instituted during the Suspension, and the Club has refused to pay the associated six equity Redemption Amounts, even after lifting the Suspension.

98.     The Club's decisions both to institute the Suspension and to refuse to pay the equity Redemption Amounts following the lifting of the Suspension with respect to the six new members who were inducted constitutes willful misconduct whereby the Club effectively has used the funds owed to the Plaintiffs as an interest-free loan to help finance the cost overruns for the Club's capital improvements project and has delayed payment of equity redemptions to its former members in blatant disregard of the Club's own By Laws and the Act.

99.     Upon information and belief, the Board concocted this ruse as a design to delay repayment of the Redemption Amounts to all Plaintiffs.

100.    In light of the financial strains experienced by the Club due to the massive cost overruns for the Club's capital improvement project, the extraordinary high level of debt incurred by the Club, and other factors, the Club has intentionally ignored or "slow walked" its obligation to refund equity amounts to its former, resigned members in order to retain those substantial funds as effectively an interest free loan—over the vigorous objections by the group of former, resigned Regular Members.

## FOR A FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

101.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

102.    The Bylaws constitute a valid and enforceable contract between Plaintiffs and the Club.

103.    Plaintiffs have fully performed all the conditions of the Bylaws and relied upon the equity redemption provisions within the Bylaws at the time they resigned their memberships.

104.    The Club breached the Bylaws by failing to pay the Redemption Amounts owed to Plaintiffs when Double Eagle or Non-Resident Members converted to become new Full Regular Members.

105.    The Club breached the Bylaws by failing to pay the Redemption Amounts owed to Plaintiffs following the induction of the six new Full Regular or Provisional Regular Members who were inducted between December 19, 2019, and July 1, 2020.

106.    The Club breached the Bylaws by amending the Bylaws to initiate the Suspension.

107.    The Bylaws include an implied covenant of good faith and fair dealing.

108.    The Club also breached the implied covenant of good faith and fair dealing within the Bylaws by failing to pay the Redemption Amounts owed to Plaintiffs when Double Eagle or Non-Resident Members converted to become new Full Regular Members; by failing to pay the Redemption Amounts owed to Plaintiffs following the induction of the six new Full Regular or Provisional Regular Members who were inducted between December 19, 2019, and July 1, 2020; by amending the Bylaws to initiate the Suspension (thereby undertaking an effort to deprive Plaintiffs of benefits under the Bylaws and doing so in contravention of the Act); and/or by

falsely representing that it would refund the Redemption Amounts "[a]s soon as we receive a replacement member" when it had no present intention to carry out this promise.

109.    The Club is in material breach of the Bylaws with respect to each Plaintiff.

110.    As a direct and proximate result of the Club's breach of the Bylaws, Plaintiffs have suffered and are entitled to recover actual and consequential damages, including but not limited to the unpaid equity Redemption Amounts plus prejudgment interest at the legal rate of 8% under N.C. Gen. Stat. § 24-1 from the time the Redemption Amounts should have been paid in accordance with the Bylaws, in an amount to be determined by a jury.

**FOR A SECOND CAUSE OF ACTION**
**(TORTIOUS BREACH OF CONTRACT)**

111.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

112.    The Club committed tortious acts in breaching the Bylaws by falsely representing that it would pay the Redemption Amounts "[a]s soon as we receive a replacement member" when it had no present intention to carry out this promise; and/or by amending the Bylaws to initiate the Suspension (thereby undertaking an effort to deprive Plaintiffs of benefits under the Bylaws and doing so in contravention of the Act).

113.    As a direct and proximate result of the Club's tortious breach of the Bylaws, Plaintiffs have suffered and are entitled to recover actual and consequential damages, including but not limited to the unpaid equity Redemption Amounts plus prejudgment interest at the legal rate of 8% under N.C. Gen. Stat. § 24-1 from the time the Redemption Amounts should have been paid in accordance with the Bylaws, in an amount to be determined by a jury.

114.     The Club's conduct was willful, wanton, reckless, grossly negligent, and fraudulent; and thus, Plaintiffs are entitled to punitive damages in an amount to be determined by a jury.

## FOR A THIRD CAUSE OF ACTION
### (FRAUDULENT MISPRESENTATION)

115.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

116.     The Club made false representations to, and fraudulently concealed facts from, Plaintiffs in connection with its failure to pay Redemption Amounts owed to Plaintiffs when Double Eagle or Non-Resident Members converted to become new Full Regular Members, including, but not limited to, falsely representing that it would pay the Redemption Amounts "[a]s soon as we receive a replacement member" when it had no present intention to carry out this promise as evidenced by its consistent failure to pay Redemption Amounts to former Members following conversions from Double Eagle or Non-Resident Members to new Full Regular Members (unbeknownst to Plaintiffs), and/or concealing its failure to do so by failing to inform Plaintiffs.

117.     The misrepresentations were made by the Club with knowledge that they were false or made recklessly without regard to their truth.

118.     The Club intended that the Plaintiffs rely on the representations.

119.     Specifically, the Club reasonably calculated, and did intend, to deceive Plaintiffs by making the false representations and concealing material facts so Plaintiffs would believe that the Club was complying with its equity redemption obligations under the Bylaws, and so Plaintiffs would resign and not pursue the matter.

120.     Plaintiffs did reasonably rely upon the Club's misrepresentations.

121.    Specifically, Plaintiffs relied by resigning their Memberships with the expectation of receiving their Redemption Amounts, and they also refrained from actively seeking to determine whether the Club was paying equity Redemption Amounts in accordance with the Bylaws.

122.    The Club possessed superior knowledge of its failure to pay Redemption Amounts to former Members following conversions from Double Eagle or Non-Resident Members to new Full Regular Members, and so Plaintiffs were justified in relying upon these misrepresentations.

123.    Plaintiffs were in fact deceived by the Club's misrepresentations.

124.    Plaintiffs suffered injury as the proximate result of the Club's fraudulent misrepresentations and concealment of material facts.

125.    As a direct and proximate result of the Club's fraudulent misrepresentations and concealment of material facts, Plaintiffs have suffered injury and are entitled to recover actual and consequential damages, including but not limited to the unpaid equity Redemption Amounts plus prejudgment interest at the legal rate of 8% under N.C. Gen. Stat. § 24-1 from the time the Redemption Amounts should have been paid in accordance with the Bylaws, in an amount to be determined by a jury.

126.    Plaintiffs are entitled to punitive damages in an amount to be determined by a jury.

## FOR A FOURTH CAUSE OF ACTION
### (NEGLIGENT MISPRESENTATION)

127.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

128.   The Club made false representations to, and negligently concealed facts from, Plaintiffs as alleged in the foregoing paragraphs.

129.   Plaintiffs justifiably relied to their detriment on this information, prepared without reasonable care, by the Club which owed Plaintiffs a duty of care as the party with superior information as to the conversion of memberships and as to its failure to pay Redemption Amounts in accordance with the Bylaws.

130.   As a direct and proximate result of the Club's fraudulent misrepresentations and concealment of material facts, Plaintiffs have suffered injury and are entitled to recover actual and consequential damages, including but not limited to the unpaid equity Redemption Amounts plus prejudgment interest at the legal rate of 8% under N.C. Gen. Stat. § 24-1 from the time the Redemption Amounts should have been paid in accordance with the Bylaws, in an amount to be determined by a jury.

131.   Plaintiffs are entitled to punitive damages in an amount to be determined by a jury.

### FOR A FIFTH CAUSE OF ACTION
### (VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT)

132.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

133.   The Club committed unfair and deceptive acts and trade practices as set forth above.

134.   The Club's actions as set forth above were in or affecting commerce, particularly given that the Plaintiffs had resigned and no longer were members in the Nonprofit Corporation.

135.    These unfair and deceptive acts were immoral, unscrupulous, substantially injurious, deceptive, unethical, and/or oppressive.

136.    These actions constitute a violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA").

137.    As a direct and proximate result of the Club's violation of the UDTPA, Plaintiffs have suffered injury and are entitled to recover actual and consequential damages, including but not limited to the unpaid equity Redemption Amounts plus prejudgment interest at the legal rate of 8% under N.C. Gen. Stat. § 24-1 from the time the Redemption Amounts should have been paid in accordance with the Bylaws, in an amount to be determined by a jury.

138.    Plaintiffs are entitled to recovery of treble damages pursuant to N.C. Gen Stat. § 75-16.

139.    The Club willfully engaged in the act or practice, and there was an unwarranted refusal by the Club to fully resolve the matter which constitutes the basis for the suit, thereby entitling Plaintiffs to the recovery of a reasonable attorney's fee pursuant to N.C. Gen Stat. § 75-16.1.

### FOR A SIXTH CAUSE OF ACTION
### (DISSOLUTION)

140.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

141.    Plaintiffs are entitled to a judicial dissolution of the Club on the basis of N.C. Gen. Stat. § 55A-14-30(a)(2)(b), namely that "[t]he directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent."

142. The actions described above as breaches of contract, breaches of good faith and fair dealing, tortious breaches of contract, fraudulent misrepresentations, negligent misrepresentations, and violations of the UDTPA demonstrate the requisite illegal, oppressive, or fraudulent conduct.

143. Plaintiffs are entitled to the appointment of a receiver pursuant to N.C. Gen. Stat. § 55A-14-31 during the pendency of the proceeding.

## FOR A SEVENTH CAUSE OF ACTION
### (DECLARATORY JUDGMENT)

144. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

145. Pursuant to 28 U.S.C. § 2201 and/or N.C. Gen. Stat. §§ 1-253, *et seq*., this Court has the power to declare the rights of Plaintiffs under the Bylaws.

146. Plaintiffs and WHGC are in a dispute concerning the construction and effect of the Bylaws, including but not limited to Plaintiffs' entitlement to receive payment of their Redemption Amounts pursuant to Article VII of the Bylaws.

147. Accordingly, the Court should hear this matter and declare:

   a. The Redemption Amounts owed to the Plaintiffs are as set forth in Paragraph 16 above.

   b. The order of Plaintiffs on the Priority List.

   c. Per Section 4 of Article VII of the Bylaws, the number of times the payment of a Redemption Amount to a former member according to his order on the Priority List was triggered "at such time as the Club admits a new Full Regular Member or Provisional Regular Member in accordance with these Bylaws."

   d. That when a Double Eagle Member becomes a Full Regular Member through conversion, then the Club has "admit[ted] a new Full Regular Member," and therefore the obligation of the Club to pay the Redemption Amount to the next former member on the Priority list is triggered.

e.  That when a Non-Resident Member becomes a Full Regular Member through conversion, then the Club has "admit[ted] a new Full Regular Member," and therefore the obligation of the Club to pay an Equity Redemption to the next former member on the Priority List is triggered.

f.  The number of times a Double Eagle or Non-Resident Member has become a Full Regular Member through conversion, thereby triggering the Club's obligation to pay the Redemption Amount to former members on the Priority List.

g.  Plaintiffs' entitlement to receive the Redemption Amounts owed to them.

h.  The Suspension violated N.C. Gen. Stat. § 55A. § 55A-2-06, -10-20, and/or 10-21.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court:

1.  Enter judgment in favor of Plaintiffs and against the Club for damages resulting from the Club's breach of the Bylaws, breach of good faith and fair dealing, tortious breach, fraud, negligent misrepresentation, and violation of the North Carolina Unfair and Deceptive Trade Practices Act in an amount to be determined at trial;

2.  Award pre- and post-judgment interest as allowed by law;

3.  Award punitive damages for the Club's tortious breach of contract, fraud, and negligent misrepresentation;

4.  Award treble damages pursuant to N.C. Gen. Stat. § 75-16 for violation of the North Carolina Unfair and Deceptive Trade Practices Act;

5.  Enter judgment in favor of Plaintiffs and against the Club for attorneys' fees as allowed by law, including without limitation N.C. Gen. Stat. § 75-16.1, and other costs of this action;

6.  Grant an order of Dissolution;

7.      Appoint a Receiver;

8.      Grant a declaratory judgment as requested above;

9.      Try Plaintiffs' claims before a jury; and

10.     Grant any other and further relief as the court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury for all issues so triable.


                                Respectfully submitted,

                                s/ William M. Wilson III
                                William M. Wilson III (N.C. Bar # 25764)
                                Wade S. Kolb III (N.C. Bar # 41373)
                                WYCHE, P.A.
                                Post Office Box 728
                                Greenville, South Carolina 29602-0728
                                Telephone:  (864) 242-8200
                                Facsimile:  (864) 235-8900
                                Email:  bwilson@wyche.com; wkolb@wyche.com

November 5, 2021               ATTORNEYS FOR PLAINTIFFS